Of Counsel:
ASHFORD & WRISTON
A Limited Liability Law Partnership LLP

ELLEN A. SWICK        10514-0
First Hawaiian Center, Suite 1400
999 Bishop Street
Honolulu, Hawaii 96813
Telephone: (808) 539-0400
email: eswick@awlaw.com

Attorney for Creditor Ronda Beselt

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| | | |
|---|---|---|
| In re | ) | CASE NO. 23-000149 |
| | ) | (Chapter 13) |
| PETER CHEN HSIEH, | ) | |
| | ) | DECLARATION OF CREDITOR |
| Debtor. | ) | RONDA MELNYCHUK-BESELT |
| | ) | |
| | ) | |
| | ) | Hearing Date: July 18, 2023 |
| | ) | Hearing Time: 9:30 a.m. |
| | ) | Hearing Judge: Hon. Robert J. Faris |
| | ) | |
| | ) | Related Docket No. 31 |
| | ) | |

UNITED STATES BANKRUPTCY COURT FOR THE

DISTRICT OF HAWAIʻI

| | |
|---|---|
| In re<br><br>PETER CHEN HSIEH,<br><br>        Debtor. | CASE NO. 23-0149<br>(Chapter 13)<br><br><br>**DECLARATION OF CREDITOR RONDA MELNYCHUK-BESELT; EXHIBITS "A" – "WW"**<br><br>Hearing: July 18, 2023<br>Time: 9:30 a.m.<br>Judge: Honorable Robert J. Faris |

**<u>DECLARATION OF CREDITOR RONDA MELNYCHUK-BESELT</u>**

I, RONDA MELNYCHUK-BESELT, hereby declare under penalty of perjury in the State of

Hawaii as follows:

1. I am one of several creditors in Debtor Peter Chen Hsieh's ("Hsieh") newest bankruptcy
   filing.

2. I make this Declaration on my personal knowledge and good faith belief.

1

3.   I make this Declaration in support of my Motion to Dismiss and to provide the truth to this Honorable Court since Debtor Hsieh, in his July 14, 2023 Declaration has repeatedly lied, misrepresented the facts, and perjured himself before this Court in an attempt to avoid his responsibility to compensate me for the harm he has caused me during his representation of my serious personal injury case in Hawai`i.

4.   Hsieh asserts that my claims involve just a simple legal malpractice action. There is nothing farther from the truth. Please read over Hsieh's Exh. "2" in his Declaration which is my More Definite Statement (without exhibits), filed September 27, 2021. The truth is very different than what Hsieh portrays in his Declaration.

5.   <u>I believe that my claims of sexual assault, threatening assault, assault battery/ terroristic threatening, negligence and negligent misrepresentation, fraudulent misrepresentation (attorney's lien claim, billing and other misrepresentations), negligent supervision of co-counsel, breach of contract, intentional infliction of emotional distress, punitive damages, willful and wanton disregard of Hsieh et al., legal duties and responsibilities to their client thus constituting legal malpractice are **nondischargeable in Hsieh's bankruptcy filing(s).**</u> (emphasis added)

6.   Hsieh represented me from the day Mark Beselt and I signed a co-counsel retainer agreement with him on May 21, 2018 until he was allowed to withdraw his representation, due to his lies to my Second Circuit Judge Peter T. Cahill (" Judge Cahill"), on July 19, 2019.

7.   Hsieh has produced **fraudulent billing** as part of his Attorney's lien filed on February 1, 2021 in my underlying Waldorf Astoria case 2cc16-1-00597(2) which this court needs to be aware of in determining whether Hsieh should be held accountable for his actions. (emphasis added)

2

8. I know that Hsieh is stashing money as he told me during our "romantic relationship" that Michael Green was paying him in cash because of Hsieh's problems with the IRS, especially after the IRS seized $100 000 from his bank account in September 2018.

9. At that time, Hsieh told me that he could no longer put money in his bank account and needed to hide it from his creditors, the IRS and his first ex-wife Dawn Yoshioka ("Yoshioka"). Hsieh told me in that conversation that he never intends to pay Yoshioka the substantial child support that he has owed and failed to pay for more than 20 years.

10. I believe that with an opportunity to obtain discovery from Hsieh and further investigation, I will discover where some of his money, that he has been tucking away since 2018, will be found.

11. I make this Affidavit and present true and correct copies of exhibits that will show this Honorable Court that Debtor Hsieh has no credibility, has lied repeatedly to prevent the consequences of his actions for his egregious conduct and has attacked me in his declaration with unproven false allegations that equate to defamation, which will be prosecuted against him in the near future.

A. **HSIEH'S SEXUAL ASSAULTS UPON ME DURING REPRESENTATION**

12. I filed a Supplemental Declaration in my Second Circuit civil action. A true and correct copy of my notarized Supplemental Declaration, filed February 16, 2021, is attached hereto as Exhibit "A".

13. In my Supplemental Declaration it is clear that Hsieh preyed on me and coerced me while I was under duress and in a brain injury rehabilitation program out of Victoria, British Columbia, Canada. Hsieh coerced me into a romantic relationship with him which began in early August 2018 until I finally ended it in late February 2019.

3

14. I am not the only client that Hsieh has coerced and seduced into a romantic relationship. He told me of others and that was how he justified that it was okay to "date" and have "sexual relations" with his clients (assuming those were consensual, unlike our relationship).

15. Hsieh is a predator that finds vulnerable and even injured women to take advantage of. There is no lie big enough that Hsieh would not say in order to be free from accountability for his conduct.

16. Hsieh's strategy and purpose for his Declaration, just like Defendant Waldorf's strategy in the underlying case, when you do not have the facts on your side and you do not have the truth on your side- the only thing you have left is to attack the credibility of the victim.

17. No romantic relationship existed between Hsieh and I prior to Hsieh's representation. This romantic relationship is undisputed, even by Hsieh's testimony at the May 24, 2023, 341 Meeting of Creditors.

18. Hsieh admitted to having a physical relationship with me, which started in Victoria, BC, during his May 24, 2023 341 Meeting of Creditors when he was asked the following:

> Swick: **"So there was no physical relationship between the two of you?"**
>
> Hsieh: **"<u>Not until she convinced me to fly to Victoria.</u>"**

19. A true and correct copy of pages 15-16 (Hsieh's admission noted above) of the May 24, 2023 341 Meeting of Creditors, is attached hereto as Exhibit "B".

   a) Furthermore, as a testament to Hsieh's falsehoods, he testified, "[B]asically, she convinced me to fly to Victoria to- because she was going to see her—one of her doctors there for a follow-up." [Exh. "B", pg. 16:3-6] Firstly, Hsieh pressured me into allowing him to join me in Victoria, BC for the purposes of the romantic

4

relationship and to try and seduce me into having sexual intercourse with him. I indicated to him that he could come but he had to have a separate room because I did not want to be sexually intimate with him. In our text messages of September 4, 2018 [Exh. "A", Decl. ¶¶ 85-86], I asked Hsieh, "What are your thoughts on Nov 14-17?" Hsieh replied back, "Looks great. Let's do it." It does not appear that I "convinced" Hsieh to come to Victoria, BC.

b) Hsieh, in his Declaration, pg. 16, states that I had a "doctor appointment follow up" [Exh. "B", Pg. 16:4-6] Conveniently, Hsieh left out in his testimony that I was in Victoria, BC, trying to recover from my traumatic brain injury/visual rehabilitation program from the January 7, 2015 umbrella incident and saw several treaters.

12. What Hsieh left out in his May 24, 2023 admission, noted above, was that the **"physical relationship" (ie. Sexual) was Not Consensual**- as I repeatedly told Hsieh from the very beginning that I did not want to be intimate with him in any way; however, Hsieh did not like to hear "No" from a woman.

13. In my February 16, 2021 notarized Supplemental Declaration [Exh. "A" Decl. ¶122], I stated, as follows:

> "The first night of our three-night stay, on November 14, 2018, did not go well as Mr. Hsieh had other intentions than what I had told him I felt comfortable with. We spent the evening in my room and Mr. Hsieh was very intent on exploring the sexual parts of our relationship. We had sexual relations. **When I asked Mr. Hsieh to stop as things were moving too fast, Mr. Hsieh did not want to get off of me, and the further actions that resulted were NO LONGER CONSENSUAL."**

14. In my **oral deposition** of May 16, 2022 regarding my arbitration against Hsieh, I was asked about whether the sexual relationship was consensual by Defendant Glenn Useugi's Attorney Ken Robbins as follows:

5

| Robbins: | You claim you had a sexual relationship with Mr. Hsieh, correct? |
|---|---|
| Beselt: | Yes. |
| Robbins: | Was that a consensual relationship or did he force himself on you? |
| Beselt: | It was both. |
| Robbins: | So you consented to having sex with him. Is that what you are saying? |
| Beselt: | No, I didn't. |
| Robbins: | So the sexual relationship you had with him was not consensual? |
| Beselt: | I consented to us kissing and holding hands and being in a personal relationship. I wanted to take it slow because I was still married. My marriage was on the rocks and Peter Hsieh took advantage of me when I was vulnerable and weak and **preyed on me when I was at my least ability to fight him off.** |

> **So there were times where he forced himself upon me as I'm sure you're aware, Mr. Robbins, that was NOT CONSENSUAL.**" (emphasis added) [Exh. "C", Pg. 147, lines 5:25]

15. A true and correct copy of page 147 of my May 16, 2022 deposition in the arbitration against Hsieh et al., is attached hereto as Exhibit "C".

16. In a call between Hsieh and I on October 12, 2018 [Exh. "A", Decl. ¶¶ 108-110] which I recorded due to the previously forged medical and employment authorizations by previous counsel Bickerton Dang, Hsieh explicitly expressed his sexual desires and what he intended to do to me as follows:

6

**Hsieh:** You need—yeah, you need to relax and feel good.

**Beselt:** No, but I think—

**Hsieh:** You need to have me between your legs and lick you every morning.

**Beselt:** Stop. Stop.

**Hsieh:** And squeeze and suck your boobs—

**Beselt:** Stop.

**Hsieh:** --and finger you.

**Beselt:** Stop.

**Hsieh:** And rub my penis up and down your vagina."

[Exh. "A", Decl. ¶¶ 108-110, (Exh. "42" Suppl. Decl.)]

17. Hsieh testified in the May 24, 2023 Meeting of Creditors that our relationship, "[h]ad always been professional." [Exh. "B", Pg. 16:18]. Clearly, as noted above, that was another one of Hsieh's lies. Professional attorneys do not speak to their clients this way. It is clear what Hsieh wanted from our relationship, regardless of my saying "Stop - 4 times."

18. Throughout Hsieh's representation, he was constantly threatening me to do whatever he told me to do or else he would withdraw his representation and/or destroy my case against the Waldorf. Hsieh had to have complete control over me- this included his sexual desires- as he would not stop when I requested.

19. On June 8, 2018, only a few weeks after Hsieh signed on as my counsel, and due to Hsieh's paranoia regarding my May 31, 2018 email sent to him as a synopsis of our first meeting of May 21, 2018, [Exh. "A", Decl. ¶¶ 20-22 (Exh. "4" Suppl. Decl.)] he called Mark Beselt and I and told us he and co-counsel were withdrawing. Hsieh directed us that if we wanted him, Green and Uesugi to remain as our attorneys that we were to email him that, "we

7

would agree to do anything he told us to do and not ask any questions". Hsieh told us that if we would not agree to his demands that he would withdraw. Under the threat of withdrawal and as directed by Hsieh, we emailed Hsieh on June 8, 2018, which states:

> "In our conversation, it has become extremely clear that the best way to continue having you represent us is for us to adhere to the following conditions, which we intend to: 1. Do not ask Peter questions, **ever**; 2. Do not ask Peter to clarify or explain anything in regards to my law suit or the process of litigation; 3. Listen to everything Peter asks us to do without needing to understand; 4. Be a cooperative, compliant and low maintenance client because Peter is the lawyer and it is best for him to have client control; 5. Trust Peter in all matters pertaining to the civil action and follow his directions; 6. Don't repeat myself should there be any oral communications in the future; 7. Email responses should be limited to Thanking Peter and that's all." [Exh. "A", Decl. ¶¶ 21-23, (Exh. "5" in the Suppl. Decl.)]

20. Hsieh would not communicate and let us know if he and co-counsel were withdrawing as our counsel or not after the above noted call on June 8, 2018. Therefore, from March 2, 2108 to July 11, 2018 or later, no attorney in the Law Office of Michael Jay Green & Associates took any action on our case. Finally, Hsieh called me on July 11, 2018 to tell us he would stay in the case- but I had to do everything he told me to do or else. Hsieh replied to the above email on July 16, 2018. His email reply stated, "Pursuant to our telephone conversation last week on July 11, 2018, this email confirms that Michael Green and I will stay in this case and continue to represent you, based on the promises you made in your email (see below)." A true and correct copy of this June 8, 2018 email with Hsieh's July 16, 2018 reply, is attached hereto as Exhibit "C".

21. Hsieh had to have total control over me at all times. He even told Mark and I and our children, on July 20, 2018, as he was speaking to me over speaker phone in my vehicle, "**That I would do anything he told me to do including drinking his pee.** I replied back to Hsieh in a text message that day, "**The comment about drinking your pee was really**

8

**awful, disrespectful and deserving of an apology**." (emphasis added) [Exh. "A", Decl. ¶ 34, (Exh. "10" Suppl. Decl.)]

22. **Hsieh, while representing me in my serious personal injury civil action, sexually molested and sexually assaulted me repeatedly in Victoria, BC (November 14-17, 2018), in Kihei, Maui (Jan 22-27, 2019) and in Honolulu, Oahu (January 28-30 and February 2, 2019). I did not provide my consent to have sexual relations with Hsieh.** [Exh. "A", Decl. ¶¶ 8, 9, 122, 135, 145, 150.]

23. I finally had the courage to end the romantic relationship with Hsieh in late February 2019. On February 22, 2019, I sent him a text message which states, "How disrespectful! I will not sleep with you EVER!!!!" [Exh. "A", Decl. ¶ 161, (Exh. "63" Suppl. Decl.)] Hsieh did not deny my statement in his return text message. Id. I would not have texted Hsieh this, if he was not pressuring me and forcing himself onto me. Obviously, the sexual relations were not consensual.

24. Shortly thereafter the "break up" of the personal romantic relationship, on or about March 7, 2019, Hsieh threatened to harm me and my family if I did not keep my mouth shut about it to Green, the ODC or anyone else. [Exh. "A", Decl. ¶ 178]

25. A true and correct copy of my long-time family physician, Sameena Bajwa, M.D.'s medical note dated October 20, 2022, regarding a discussion we had about Hsieh's sexual assaults of me, is attached hereto as Exhibit "E".

26. My Forensic Psychiatrist, Dr. Stephen Raffle diagnosed and opined in his report that I experienced "**Slow-moving Rape/Sexual Molestation by previous attorney Hsieh.**" (emphasis added)

27. A true and correct copy of Dr. Raffles' August 30, 2021 report, pages 1, 33-34, 38-40, 51, 54-56, are attached hereto as Exhibit "F".

28. Because of Hsieh's unprofessional and unethical, not to mention criminal conduct, I have filed two lengthy complaints against Hsieh with the Hawaii Office of the Disciplinary Counsel ("ODC") since 2021, case file no. 21-0165.

29. A true and correct copy of an email from the ODC to me on July 11, 2022, requesting an interview, is attached hereto as Exhibit "G".

30. Unfortunately, I was unwell and unable to be interviewed by the ODC until many months later.

31. I believe Hsieh will be disbarred for lying, his sexual assaults on me and all the other appalling acts that he did to me and Mark Beselt during and after his representation.

32. Hsieh's July 14, 2023 Declaration which asserts my claims arise from a simple legal malpractice civil action are patently false and a misrepresentation to this Honorable Court.

33. I was seriously and catastrophically injured on January 7, 2015 when an unsecured cabana umbrella weighing approximately 20 lbs struck me in the head/face/body at a speed of 40-60 miles/hour. I have permanent injuries: a traumatic brain injury, spinal cord injuries requiring triple spine surgery (in 2017), visual issues, hormone dysfunction, chronic nerve and muscle pain, atrophic muscle loss, numbness in my fingers, hands, feet and toes, nerve damage in which I spontaneously drop items from my hands, PTSD, anxiety, etc. I have never fully recovered from my injuries and my ongoing medical expenses keep me in poverty and unable to work more than half time.

U.S. Bankruptcy Court - Hawaii   #23-00149   Dkt # 42   Filed  07/18/23   Page 11 of 46

34. Mark Beselt had a loss of consortium claim which Hsieh talked him into dropping in 2018, nearly two years after the civil action was filed in December 2016, so that Hsieh could have me all to himself.

35. To date, I have received no compensation, whatsoever, for my very serious injuries (noted above). I deserve to be fairly compensated for the injuries I suffered due to the Waldorf=Astoria Management Inc. I deserve to be fairly compensated from attorney, Debtor Hsieh, who destroyed my case, at first because of his negligence, then after February 2019 when I refused to get back together with him in a relationship, or have consensual sexual relations with him, who purposefully, maliciously and intentionally injured me during and after he represented me.

**B.** **IN DIRECT RESPONSE AND CHRONOLOGICAL ORDER TO HSIEH'S LIES, MISREPRESENTATIONS AND FRAUD IN HIS DECLARATION**

36. [Dkt. 41, Par. 3] Hsieh has successfully evaded discovery in the legal malpractice arbitration since its inception in May 2021. I have had to pay for an attorney to file four Motions to Compel Discovery against Hsieh because he will simply not comply.

    a) A true and correct copy of my first Motion to Compel Discovery with Exhibits A-O, filed September 13, 2021, is attached hereto as Exhibit "H".

    b) In my first Motion to Compel, Hsieh refused to answer the requests with any meaningful response, was deceitful in his Admissions, changed the wording from "Defendants" to "Claimants" in my Request for Interrogatories to avoid and evade providing information and did not answer most of the requests, stating, "Same objections and response as No. 1." However, no. 1 was a complete lie and only pertained to response no. 1 as all the requests had different requirements.

c) A true and correct copy of my Second Motion to Compel Discovery (First Motion during Bosko Petrievic's representation of me in my arbitration), filed March 14, 2022 and again on March 24, 2022, via email, as per the instructions of arbitrator retired Judge Karl Sakamoto, is attached hereto as Exhibit "I". Again, Hsieh did not want to produce the documents or interrogatories that the arbitrator ordered.

d) At the March 28, 2022 hearing on the Second Motion to Compel Discovery, Hsieh was fined $500.00 for his discovery abuses. A true and correct copy of a March 29, 2022 email verifying this sanction, is attached hereto as Exhibit "J".

e) A true and correct picture of the check that Hsieh paid me for being sanctioned over his willful and wanton disregard of the arbitrator's Orders to provide discovery in the amount of $500.00, is attached hereto as Exhibit "K". However, this discovery abuse sanction did not prevent Hsieh from continuing to avoid his responsibilities and the arbitrator's Orders.

f) A true and correct copy of my Third Motion to Compel Discovery (Second for Petricevic) filed on April 1, 2022, is attached hereto as Exhibit "L". Hsieh, again did not want to produce the documents the arbitrator ordered.

g) A true and correct copy of my Fourth Motion to Compel Discovery (Third for Petricevic) and Declaration (no exhibits) filed on July 4, 2022, is attached hereto as Exhibit "M". Hsieh, again did not want to produce the documents the arbitrator ordered.

h) My declaration to Petricevic's Third Motion to Compel goes into much more detail of <u>Hsieh's sexual assaults upon me</u>.

i) This discovery abuse continued throughout the arbitration causing significant delays due to Hsieh's disobedience and deceitful attempts to cover up his egregious acts upon me and his actions and inactions which caused my 10+ million dollar case to be utterly destroyed to the point it could not be presented for trial.

j) A true and correct copy of a February 21, 2023 email from Petricevic to the arbitrator two days prior to the status conference hearing to let him know that we still needed basic discovery from Hsieh, is attached hereto as Exhibit "N".

k) Conveniently Hsieh cowardly filed a false bankruptcy claim on March 1, 2023 which again stayed the arbitration so that he could avoid the eventual outcome-Justice and Compensation for what he has done to me, Mark Beselt and our family.

l) For over two years, Hsieh has effectively avoided, evaded, lied and delayed discovery for the purpose of records being lost, destroyed and for him to hide what truly took place during the underlying Waldorf case for the sole reason of avoiding liability and postponing my award and recovery for my serious injuries and the additional harm that Hsieh has caused me, including punitive damages.

37. [Dkt. 41, Par. 4] I began being represented by Michael Green ("Green") and Glenn Useugi ("Useugi") when Mark Beselt and I signed a retainer agreement with both attorneys on March 2, 2018, which they executed on March 9, 2018. [Hsieh Decl., Exh. No. 1., Pg. 6-9/52] Hsieh phoned me on May 4, 2018 and wanted to join in as co-counsel. Hsieh executed a co-counsel agreement on May 21, 2018 when we were in Green's office. [Hsieh Decl. Pg. 18/52]

38. [Dkt. 41, Par. 5] It was a non-jury trial because Matson Kelly did not file a demand as instructed to by Mark Beselt and I. However, that could have been repaired by Hsieh. In late July - August 2018, after Uesugi and Hsieh pressured us to drop the State of Hawai`i as a defendant because "it was too much work to go after the State", Hsieh

13

reminded Mark and I that we had to do everything he told us to do or else. Since Hsieh had just reminded us on July 20, 2018 that we had "to do anything he told us to do, including drinking his pee", we reluctantly agreed to do what Hsieh demanded. We did not want to drop the State as a defendant. At that time, I asked Hsieh to demand a jury trial since there was only going to be one defendant, the Waldorf=Astoria. But Hsieh refused to file a Motion to Demand a Jury as I asked. Furthermore, Hsieh bullied Mark into dropping his loss of consortium claim even though Mark had been a Plaintiff now for nearly two years. Predator Hsieh did this for the purpose of getting Mark out of the lawsuit so that he could have me all to himself. A true and correct copy of the Stipulation for Partial Dismissal with Prejudice As to Plaintiff Mark Warren Beselt and Defendant Department of Land and Natural Resources, State of Hawaii, filed August 9, 2018, is attached hereto as Exhibit "O".

39. [Dkt. 41, Par. 6] Hsieh provided Waldorf counsel on March 13, 2019 a settlement demand in the amount of $8.25 million, <u>without my approval or consent to the amount he demanded.</u> Hsieh testified in the May 24, 2023 341 Meeting of Creditors that I made a claim of $8 million; however, you will see it was Hsieh's signature on the bottom of the last page of the mediation demand, not mine. I had no idea what the demand was until after Hsieh provided me a copy which he had sent to mediator, Keith Hunter and Waldorf earlier. A true and correct copy of the first two and last three pages of Hsieh's settlement demand, is attached hereto as Exhibit "P".

   a) My case is worth over $10 million given my permanent injuries; however, Hsieh was angry as I had recently ended our personal relationship on or about February 22, 2019 [Exh. "A" Decl, ¶¶ 161-184, (Exh. "63"-"64" Suppl. Decl.)] and because of Judge Cahill's sanctions that I endured because of Hsieh's errors in failing to obtain my discovery. I lost over $2.1 million in wage loss, future earning capacity, pension, etc. Hsieh told me that he kept the demand lower than he would have because he was angry and because of the discovery sanctions- which he and his co-counsel were the direct and proximate cause, unlike what he attempts to portray in his Declaration.

14

40. [Dkt. 41, Par. 6] Hsieh refused to obtain any of my medical or employment records while he represented me, even though, on my own accord, I had provided him over 32 written authorizations in July 2018 to get my attorneys to start gathering discovery since they sat on my case for nearly five months and would not lift a finger to start discovery. A true and correct copy of my July 18, 2018 email, is attached hereto as Exhibit "Q".

   a) Judge Cahill severely sanctioned me for what my attorney's failed to do- which was obtain my discovery. Instead, Hsieh knowing that there was an issue with getting my medical and employment records due to Bickerton Dang's forged authorizations the year before, Hsieh told me not to interfere by getting any more of my records. Instead Hsieh allowed Defendant Waldorf to obtain discovery on blank authorizations (which I signed July 21, 2018) knowing that the providers in Canada would be hesitant and/or would not provide the records given the breaches that took place in 2017. Hsieh knowingly allowed Waldorf to play games for over 6 months when he was well aware that Waldorf was forging authorizations (Sandra Cole- Ma's paralegal) was not obtaining the records, would not pay providers for the records and thus Judge Cahill sanctioned me for my attorneys errors. This resulted in extremely low Rule 68 offers. Hsieh provided the Second Circuit Court with what actually had taken place with discovery in his Memorandum in Opposition to the Motion to Compel (only part 1 due to length), filed February 4, 2019, attached hereto as Exhibit "R".

   b) Contrary to Hsieh's testimony at the May 24, 2023 341 Meeting of Creditors in which he stated,

> "And then soon after we withdrew or soon after we notified her of our withdrawal, but before the hearing on our motion to withdraw was held, she settled with the defense. And so basically we made a claim for an attorneys' lien on the grounds that we had carried the ball substantially to the goal line only to have to withdraw and only for her to settle the case close to the number that we were trying to negotiate for in mediation with Keith Hunter. [Exh. "S", Pg. 8:9-18]

15

c) Hsieh and co-counsel first notified me of their withdrawal on June 6, 2019, shortly after my Motion for Reconsideration was denied on May 24, 2019 and the last time that Hsieh attempted to "touch" me in an intimate way after the May 24, 2019 hearing. The Motion for Reconsideration was denied because Hsieh could not get all my records, which I obtained myself in 2019, bates stamped properly and given to defense. Cahill, furious with Hsieh's incompetency took it out on me. Hsieh's withdrawal went to hearing on July 19, 2019, in which he lied to Cahill to allow his withdrawal. I settled under duress, lacking capacity on August 5-6, 2019 for less than 1% of the value of my claims due to my attorneys errors. Hsieh's above testimony that I settled before their motion to withdraw was granted on July 19, 2019, is patently false- as is the majority of his July 14, 2023 Declaration.

d) Secondly, as per Hsieh's testimony at the May 24, 2023 341 Meeting of Creditors, we were not trying to negotiate a $200 000 or $300 000 dollar settlement. The last counter offer that Hsieh advised me to make at mediation was $7.25 million. In an April 29, 2019 email from Hsieh to I, Hsieh asked me if I want to "counter with 3.3 million." I replied to Hsieh, " "Hi Peter, Pursuant to our telephone conversation today, our last counter offer at the March 15, 2019 mediation was 7.25 million so therefore, a counter to the Rule 68 of 3.3 million doesn't seem unreasonable." A true and correct copy of this email dated April 29, 2019, is attached hereto as Exhibit "T".

41. [Dkt. 41, Par. 7] Hsieh and co-counsel provided me notice on June 6-7, 2019 that they were withdrawing due to the fact that I emailed stating my concerns about having Judge Ochiai as my settlement conference Judge since no Judge had been appointed by Judge Cahill yet. That was my counsel's excuse for withdrawing their representation. The true reason they withdrew is because Hsieh screwed up my case by his actions and inactions and he did not want Green to find out and because I rejected Hsieh. Green stated he was withdrawing because, "You will not dictate to me how I will proceed with Trial...what experts to call...or what settlement judges I will use." I had not done any of these

16

allegations; however, my case was so badly damaged since I had limited discovery, my experts were being tossed at a 104 evidentiary hearing because Hsieh gave them records they could not have based on the incorrect March 14, 2019 Order (which Hsieh did not bother to correct with the Court) and because Hsieh et al. purposely failed to file a Final Naming of Witnesses, due May 31, 2019. That is the true reason my attorneys suddenly decided to withdraw and blame everything on their client- as they have done many, many times in the past. A true and correct copy of the June 7, 2019 email withdrawal notice, is attached hereto as Exhibit "U".

a) This June 7, 2019 email is contrary to Hsieh's testimony at the May 24, 2023 341 Meeting of Creditors in which he stated, "[S]uffice it to say there was a disagreement between us and Ms. Beselt on the mediation goals to the point where we had to file a motion to withdraw." [Exh. "S" Pg 8:1-5.] Nothing in Green's email notice to withdraw (above) lists any differences in mediation goals.

b) Additionally, I was very reasonable given my lawyers errors and even authorized Hsieh et al., on June 7, 2019, via the email back and forth, to come down to $475 000. There was no issue with the amount of the settlement as Hsieh testified to in the Meeting of Creditors. Hsieh is a liar and has no credibility. My June 7, 2019 email to my attorney's states, " I have already authorized you to put in another Rule 68 offer for $750 000 and to go as low as $475 000 to settle my case. If you think it is necessary, I can go lower because something is better than nothing." [Exh. "U"]

c) I called Jim Krueger ("Krueger") in the afternoon of June 7, 2019 to see if he wanted to represent me after Hsieh et al., provided notice on June 6, 2019 that they were withdrawing. There is nothing wrong with trying to find new counsel once your attorneys provide written notice that they are withdrawing. Especially given that once they provided notice to withdraw, Hsieh et al. would not answer my emails or call me or work on my case. Trial was scheduled for 3 months away. I had my deposition transcripts that needed to be corrected by June 27, 2018, but Hsieh would not do the job that he had been hired to do- similarly, as his entire representation of

17

my case. Hence, this is the reason that my case was destroyed and unable to be taken to trial.

42. [Dkt. 41, Par 8] Hsieh filed his motion to withdraw riddled full of lies on June 12, 2019 (not June 14, 2019 as Hsieh states in his Declaration). However, Judge Cahill disagreed with all the false claims made by Hsieh about me and crossed them out on Hsieh's proposed Order on the Motion to Withdraw, dated August 12, 2019. Every ground that Hsieh states as his reason to withdraw is a complete lie and Judge Cahill crossed them out. Hsieh's only purpose was to cover up his own inadequacy as an attorney. A true and correct copy of the August 12, 2019 Order is attached hereto as Exhibit "V".

43. [Dkt. 41, Par. 9] Hsieh has never provided any proof of this false statement including in his July 14, 2023 Declaration. This is just another lie by Hsieh.

44. [Dkt. 41, Par. 10] Keith Hunter ("Hunter"), mediator, emailed me on or about June 27, 2019, since my counsel refused to do any work on my behalf including trying to settle my case. Green refused the June 27, 2019 offer of $200 000 because it was not anywhere close to what my case was worth even given the damage that Hsieh et al. had done to it during their representation. The second page of the June 27-28, 2019 email chain- shows that I forwarded the offer of settlement to Hsieh et al. promptly. A true and correct copy of an email chain dated June 27-28, 2019 which I forwarded promptly to Green, is attached hereto as Exhibit "W". Hsieh's allegations that I told Hunter to communicate with me only are again patently false.

45. [Dkt. 41, Par. 11] Green was reconsidering his withdrawal between June 10-28, 2019 as he believed that it would go to settlement conference with Judge Ochiai and I might obtain at least enough to pay off some of my medical bills. Given the poor status of the case, Green was concerned about me suing him for legal malpractice. When I was in his office on May 31, 2019, Hsieh did everything he could to point the blame at me so that Green would withdraw. But Green knew that my injuries were significant, the

18

<u>Waldorf had admitted liability at the 30 (b)6 deposition in January 2019 and the Waldorf's employees were testifying that people were being injured by the same umbrella's that struck me at least once every week or month prior to my January 7, 2015 incident. Punitive damages against the Waldorf=Astoria were likely</u>. So, Hsieh lied and made up a story to tell Green that Waldorf's counsel, Calvin Young told him that Hunter told him that for two weeks, I was communicating with Hunter and telling Hunter not to talk to Hsieh et al. This is a bold face lie that Hsieh concocted to upset Green so that he would withdraw. Naturally, the email from Green is sent by Hsieh- because he made the whole thing up so that Green would get mad and withdraw. In my June 28, 2019 reply email to Green, I stated, "Calvin Young or Peter Hsieh have misinformed you. For verification, please do provide me with your email communication with Calvin on this matter. I have not had any communications with Hunter, until I received an email from his yesterday, which I promptly forwarded to you. Please ask Keith. He will verify this on my behalf." [Exh. "W"- pg. 1]

I further stated in this email, "**Your attorney Peter, has not been forthright and honest with you**."

a) I did not want to be with Hsieh any longer as stated in my text message to him on March 29, 2019 in which I stated, "I do not want to be with you again," and in the next text, "I am not sure why you don't understand when I tell you that I don't want to be with you again. I have told you this in every conversation that we have had…" [Exh. "A", Decl. ¶¶ 193-195 (Exh. "73" Suppl. Decl.)] Hsieh could not accept the rejection plus he had blown my case- so he just wanted to do damage control and get rid of my case so that he could avoid me and the difficult position he put both of us in with the impermissible romantic relationship. Hsieh's Declaration is just a continuation of the web of lies he created in 2018-2019 to cover up his romantic relationship and sexual assaults of me and how he destroyed any possibility of me <u>getting fair compensation from a Hilton hotel- with an unlimited insurance policy</u>.

19

46. [Dkt. 41, Par. 13] Hsieh has never provided any details on how he "surmised" the settlement amount. But it was likely his old friend, Young, Defendant Waldorf who he use to work with years prior that helped Hsieh "surmise" the amount. The $250 000 was less than half of my medical expenses at that time. I have never received any of the settlement amount.

47. [Dkt. 41, Par. 14] As told in every pleading in the Second Circuit since 2021 and in the arbitration, John Rapp ("Rapp") never represented me, yet Hsieh continues with this false narrative because he will declare and lie under oath to try and blame the poor results of the outcome of my case on another attorney if it may get him off the hook for paying for the damage Hsieh caused me. A true and correct copy of my May 5, 2021 Motion to Stay the Proceedings and to Set Aside Settlement Agreement (parts 1-2 only), is attached hereto as Exhibit "X".

   a) On page 9 of my Motion, it clearly states, after the settlement was already agreed to on August 5, 2019 which Waldorf would not let me out of, I contacted Rapp to ask him if I could get out of the 11 pm agreement the night before. Rapp thought it would be unlikely. He suggested I add into the settlement, "Anything herein to the contrary notwithstanding nothing in this agreement shall be deemed to release any attorneys who have represented Releasor. Said attorneys are excluded from the definition of Releasee". Rapp's assistance was limited on August 6, 2019, the day after I had agreed to the settlement while I was under duress, lacking in capacity and unduly influenced and coerced by Waldorf to accept their settlement at 11 pm at night.

   b) Everyone knew my attorneys had blown my case- but the settlement agreement as is would have made sure that I could not pursue my claims against Hsieh and co-counsel. Hsieh made sure that Waldorf put in the settlement agreement that I could not sue my attorneys, hoping that I would sign it and release him for the damages he caused me. After the break up between Hsieh and I in February 2019, (which coincided with the timeframe of the February 13, 2019 hearing and subsequent

March 14, 2019 Order dismissing my $2.1 million dollar wage loss, etc.) Hsieh was silently working for the defense.

48. [Dkt. 41, Par. 15] Hsieh and his co-counsel were no longer my attorneys as of the July 19, 2019 [Exh. "V"] hearing on their Motion to Withdraw as my counsel when Hsieh lied to Judge Cahill that I had Krueger as my counsel in his motion. Even though I proved to the Judge that Hsieh had lied, he granted the withdrawal saying the relationship was broken. It's not that I wanted Hsieh to represent me, it was that my case was so badly damaged by that point, that I could not find other attorneys that wanted to take my case to trial in 60 days with limited discovery, no experts and no witnesses.

Hsieh would not speak to me after the hearing, in which he grabbed my leg and hurt me before it began because I was begging him not to withdraw. Afterwards, Hsieh just turned and walked away from me while I stood standing on the street, crying, completely devastated by his conduct. A true and correct copy of my last text message to Hsieh dated August 3, 2019, is attached hereto as Exhibit "Y". My case settled on August 5-6, 2019 and Hsieh's consent for me to settle my claims was not required. Hsieh continues to distort and present false information to this Honorable Court and should be sanctioned for his lies.

49. [Dkt. 41, Par. 16-17] As above, the court granted the Motion because Hsieh lied to Judge Cahill that I had another attorney, Krueger and made up events, just like his July 14, 2023 Declaration that were untrue- giving my Judge a false impression of me- which is what he did all along- throw me under the bus with Defendant Waldorf and Judge Cahill when it was him that did no work to obtain discovery in a **damages only case**. Hsieh's Reply Memorandum to his Motion to Withdraw, filed July 17, 2019, just two days prior to the hearing, untruthfully tells the Judge that I have Krueger representing me and Hsieh should be let out of the case after damaging it beyond repair.

21

a) Hsieh's lies are encompassed in the July 19, 2019 hearing transcript. A true and correct copy of the July 19, 2019 hearing transcript, pages 4-8, are attached hereto as Exhibit "Z".

50. [Dkt. 41, Par. 18-19] **<u>FRAUDULENT BILLING</u>**- Hsieh and co-counsel were ordered by Cahill to pay for the costs of sending me my file within 10 days, [Exh. "V"] since they refused to provide me with many of my documents prior to the July 19, 2019 hearing on the Motion to Withdraw, making it very difficult for me to find new counsel less than 60 days before trial. What Hsieh shipped to me did not encompass my entire file which I have still been trying to obtain through the arbitration proceeding with little success. [<u>See</u> "Exhs. "H, L, I, M"- 4 Motions to Compel in the arbitration with this same request]

a) Additionally, in Hsieh's Motion to Collect Attorney's lien, filed February 1, 2021, <u>he added the cost of delivery of my file by FedEx to his fraudulent billing statement</u>. On the billing statement- the July 29, 2019 entry for $123.08 and the August 2, 2019 entry of $131.01 for Fedex "postage" were not to be charged to me. (There are many more other fraudulent invoice amounts in Hsieh's billing statement which Ms. Swick will explore in discovery). A true and correct copy of the first page of Hsieh's fraudulent billing dated September 16, 2019 which Hsieh filed in the February 1, 2021 Motion to Collect Attorney's lien, is attached hereto as Exhibit "AA".

51. [Dkt. 41, Par. 20] Hsieh's sneaky and deceitful character is evident when he willfully and wantonly failed to serve me a copy of his Motion to Set Aside Order of Dismissal (No Activity) which he filed with the Court on December 17, 2020 requesting time to file his lien, hoping to scoop up money from me that he was not owed or had earned. Had I not accidently checked ecourt kokua on January 29, 2021, I would have had no idea what was going on and Hsieh would have likely been awarded the fraudulent fees and costs which are unsubstantiated. A true and correct copy of my Motion to Set Aside Order of Dismissal (No Activity)(parts 1 and 2 only), filed January 31, 2021, is attached hereto as Exhibit "BB". There are several highlighted areas in my Motion which show

22

where Hsieh was deceitful in the Motion. My former counsel brought this to the Court's attention as follows:

> "Plaintiff was not served a copy of Former Counsel Michael Jay Green and Peter C. Hsieh's (Collectively as "Counsel") Motion to Set Aside Order of Dismissal, filed December 17, 2020. Plaintiff, only by chance as she reviewed the information on her case available online, that she discovered on January 29, 2021, last Friday, while viewing the State of Hawaii's E-Court Kokua, that the above-entitled documents had been filed." (pg. 3)

52. [Dkt. 41, Par. 26] While being pro se, I was under duress and only allowed 3 hours and 36 minutes to accept Waldorf's substantially low settlement offer on August 5, 2019. I was under the influence of many pain killers, two glasses of wine and at the end of the day when my brain was cognitively fatigued. I was unduly influenced and coerced by Waldorf's counsel into a settlement at 11 pm at night. Hsieh put me in that position because of his negligence, laziness, deceitfulness and because I rejected his advances repeatedly. I attended two Independent Medical Exams regarding my incapacity to contract with Waldorf in August 2019, and both of the reports state that I lacked the capacity to contract.

a) A true and correct copy of Duke Wagner's, PhD. psychologist report, pages 1 and 12 dated, January 22, 2022, is attached hereto as Exhibit "CC".

b) A true and correct copy of Dr. Stephen Raffle, MD. Forensic Psychiatrist's report, pages 1, 10-11, dated February 15, 2022, is attached hereto as Exhibit "DD".

c) Because of Hsieh's willful, wanton and reckless conduct during his representation of me, I have now had to spend hundreds of thousands of dollars to arbitrate my claims against him and pursue an appeal in the ICA in the underlying case to mitigate my damages.

23

53. [Dkt. 41, Par. 29] Hsieh's counterclaims were put in to try and distract the arbitrator and create a false narrative. They have absolutely no merit. Conveniently, Hsieh left out my Answer to his untruthful counter claims in his Declaration. A true and correct copy of my Answer to Hsieh's Counterclaims (exhibits excluded for the purposes of this Declaration), filed June 16, 2021, is attached hereto as Exhibit "EE".

Many promises were made to me by my counsel Green, Hsieh and Uesugi, however, neither of the three wanted to put any work into obtaining discovery and getting my medical records in a damages only case!

a) To note at Par. 42-43 of Exhibit "EE", my counsel, Mr. Phillips, regarding Hsieh's representation and fraudulent billing stated:

> **"Dr. Peter Rossi's report was submitted late, not until June 6, 2019, and was not admitted and could not be used for evidence or testimony. Secondly, because Respondent's made no effort to obtain Claimant's discovery documents during the litigation, all Respondent's experts were to be excluded at trial by way of a 104 evidentiary hearing as ruled by the Court at the July 19, 2019 hearing on the Motion to Strike all of Plaintiff's expert's testimony and reports. Further, because Respondent failed to submit Plaintiff's Final Naming of Witnesses, due May 31, 2019, in accordance with the February 2018 Pretrial Order and Hsieh's own October 2018 Stipulation, Plaintiff had no experts or witnesses that could testify to her damages at trial set for September 2019."** [Exh. "EE", Pg. 15-16/]

54. [Dkt. 41, Par. 31] Hsieh believes that 17.5 million has no basis in reality. Hsieh is wrong and lying to cover up his responsibility for his repeated errors. Hsieh demanded $8.25 million from Defendant Waldorf which is nearly $2-4 million less than the value of my case in other similar jury verdicts and settlements in Hawai`i and/or the 9th Circuit. I suffer from permanent injures consisting of: a traumatic brain injury, spinal cord injuries which required triple spine surgery (future levels required), vision challenges requiring ongoing maintenance therapy for life, hormone dysfunction, heart issues due to sepsis

24

as a result of spinal surgery, balance issues, daily post-concussion symptoms, chronic nerve and muscle pain, PTSD, anxiety, 3 years of wage loss, now only capable of 0.5 (20 hour work weeks), etc. and approximately $2.1 million in future earning capacity, pension, benefits, etc. There are also hedonic damages over $5 million as opined by my economics expert.

Hsieh demanded a much lesser amount from Waldorf due to his own negligence in his representation and because I no longer could handle being his "slave" in a romantic relationship with him any longer and refused to consent to his sexual pursuit of me. I have over $600 000 in medical bills since 2015. I have over $250 000 in legal bills due to Hsieh's representation or lack thereof.

Because Hsieh sexually assaulted me repeatedly, I have emotional damages from him and punitive damages as well- which jury verdicts in this State run anywhere from $3-5 million because Hsieh's behavior is outrageous. Pre and post judgment interest could be well over a million dollars as well since I was injured over 8.5 years ago and should have been compensated in 2019.

<u>$17.5 million is a fair amount given the damage that Debtor Hsieh has caused me in 2018 and 2019 during his representation and the emotional distress and pain and suffering I have had to endure because of him over the past 5 years, which he keeps dragging out in his efforts to evade his responsibilities.</u>

55. [Dkt. 41, Par. 32] **<u>Hsieh absolutely sexually assaulted me repeatedly using coercion, then force when I refused to consent to his seduction of me in 2018 and 2019. I have recorded calls between Hsieh and I where Hsieh and I talked about how he forced himself onto me and went past my boundaries. One of those calls, Mark Beselt overheard in November 2018. Mark will testify as to what he heard in that call. I felt violated by Hsieh because he would not stop when I begged him to.</u>**

a) **Hsieh is not credible, is a sexual predator and I am not his first victim- client.**
He told me about two other women clients that he had perform "hand jobs" on him while he was in his backroom office. Those are documented in our text messages. [Exh. "A" Decl. ¶¶ 62-66, (Exh. "21" Suppl. Decl.)] I am sure Hsieh would like to forget about his affair with Terri Niimoto, whom he met for the first time as his client and engaged in a sexual relationship with her as well, as told to me by Hsieh. [Exh. "A", Decl. ¶ 77-78, 87-88] - text messages where we discussed Delta Chickee- AKA- Terri Niimoto who worked for Delta Airlines.

56. [Dkt. 41, Par. 32- the second 32] Hsieh's version of what took place with my May 28, 2019 deposition is completely false and an outright lie to this Honorable Court. I am absolutely credible and have not deceived anyone. It is Hsieh who is not credible. In every declaration and at both 341 Meeting of Creditors he contradicted himself multiple times and lied under oath about several different things- some of which my attorney, Ms. Swick has already addressed with this Court. Some advice for Hsieh: anyone who sexually assaults their brain injured clients should not falsely accuse others of being deceitful, manipulative, dishonest or evasive.

**For the purposes of this Honorable Court, I will prove to you Hsieh's lies**

After the Bickerton office forged authorizations in 2017 [See Exh. "R" (Hsieh's Memo in Opp. Motion to Compel filed Feb 5, 2019)]I no longer wanted to pursue my psychological damages claims because Jim Bickerton ("Bickerton"), my counsel before Hsieh, told me in January 2018 that if I wanted to pursue my PTSD diagnosis claim then I would have to provide all my psychological records. I did not know what was in my records as I had never looked at my records in the past. Therefore, in approximately February 2018, I went to the hospital to view my records because I was curious and to help me to decide whether or not I wanted to pursue my claims or not.

I was concerned because shortly after my first child was born in 2010, I had a sudden reaction and withdrawal as I had been taking motilium, prescribed by my doctors which

26

is banned in the US, not in Canada, but at four times the legal limit. I abruptly stopped this medication in 2010 and I had a bad withdrawal reaction because I am very sensitive to medications. I went to see a walk-in doctor, who I had only met once before, Dr. S. Bajwa, for heart palpitations, anxiety, severe mood swings, etc. who overreacted and sent me to see another family physician who specializes out of the Women's Mental Health Clinic, Dr. Lorraine Natho. Unfortunately, neither Dr. Bajwa nor Dr. Natho ("Natho") asked me if I had recently stopped taking any medications. Natho having never met me before diagnosed me with post-partum depression and anxiety in 2010. Once the medication withdrawal was over in three days I was back to my normal self and was no longer symptomatic. Natho reported in my notes that I went to work- early while still on maternity leave, only three days after seeing her in her office. Natho subsequently discharged me less than 2 weeks later, because "I was doing well" and she had no concerns. I only saw her once during this timeframe. I did not know what if anything she had diagnosed me with, so I was curious and wanted to know because Bickerton told me I needed to make a decision soon since his office was now sending out my authorizations for other providers in January 2018.

I have discussed this entire event with Dr. Stephen Raffle, Forensic Psychiatrist and he has reviewed all my medical records from 2005 to approximately 2021. He reported in his August 30, 2021 report that, "mental health problems may or may not have occurred in the past particularly postpartum" and "some of those problems may have been a medication reaction or side effect." A true and correct copy of Dr. Raffles, August 30, 2021 report, pages 27 and 37 which discuss the above, is attached hereto as Exhibit "FF". In my assessment, Dr. Raffle told me it did not sound like I had post-partum depression or anxiety because it does not just come and go within a few days. Plus, I am a licensed clinical social worker in Alberta who has been diagnosing mental illness since 2007. After looking at my file and diagnosis, I can attest that I do not meet the criteria for this diagnosis.

When my second son was born with serious medical conditions in 2011 and it was very stressful, I sought out Dr. Natho to speak to about my son's conditions in late 2011-2013

as she is married to a neurosurgeon. She was a good resource to discuss my son's medical conditions. Bickerton told me that I would need to produce all my psychological records if I wanted to pursue my psychological damages. I was concerned about my son's privacy since most of the records talk about him and his health issues. The records talk about my family members as well. Out of respect for their privacy, I decided that it was not worth it for me to pursue my psychological damages claims as I valued my privacy and those of others more than money. Additionally, I was embarrassed about Dr. Natho's misdiagnosis of me in 2010 and I did not feel comfortable sharing all these details with lawyers and their staff. I was a private person as most Canadians are.

I notified my attorney at that time, Bickerton, that I did not want to pursue my psychological damages claims. Bickerton told us that he would likely have to file a stipulation or have a hearing on it with the Court. Once I signed on with Green on March 2, 2018, I told him that I was not pursuing my psychological damages claims. Green agreed to take my case on this condition. I recorded this initial call with Green so that I would not forget what he told me. A true and correct copy of the transcripts, pages 20-28 of the March 2, 2018 call that I had with Michael Green, is attached hereto as Exhibit "GG". On pg. 23 of this transcript I stated to Green, "Jim and I discussed this at length, and um, we were going before Judge Cahill to see if we could keep my psych records out and drop the PTSD diagnosis." Green agreed in this March 2, 2018 call that if I did not want to pursue my psychological damages claims that he was fine with it but if I changed my mind, I could have my records put in camera.

Unfortunately, Uesugi nor Green did any work on my case between March 2, 2018 and May 2018. I had called Green on April 26, 2018 and asked him if someone was going to work on my case. At this point, Hsieh was brought in by Green to represent Mark and I as well. I spoke with Hsieh on May 4, 2018 and we agreed to come to the office in Honolulu to see Hsieh et al. on May 21, 2018 before flying back to Canada. A true and correct copy of my email to Hsieh with a synopsis of our May 21, 2018 meeting, is attached hereto as Exhibit "HH".

28

However, Hsieh, being greedy and only concerned about himself, threatened Mark and I that if I did not pursue my psychological damages claims that he and the other attorneys, Green and Useugi would withdraw their representation. After waiting for months for our attorneys to act, we were faced with either looking again or being forced to do something we did not want to do. Because there was a July 20, 2018 Status Conference coming up soon and my attorneys still had done no discovery, Mark and I felt we had no choice but to do what Hsieh demanded. In the May 31, 2018 email to Hsieh, I stated:

> "2. **You told me that you would not take my case unless I was willing to pursue emotional damages even though Mr. Green promised me that if I didn't want to pursue the emotional/psychological damages that it was ok with him.** I told you that I would think about it and later said I would sign authorizations for my psychological records given certain conditions were met."

Since the records were going to be an issue because of Bickerton's forged authorizations, I wanted to make sure that Hsieh knew the laws in Alberta which "require one authorization per provider, no blanket consents and protecting my families confidential information by way of all consent forms requesting the custodian of records to redact any information from my records that specifically related to third parties." [See Exh. "HH", point 3 a) and b)] This is in line with what Bickerton had told us and what was on the previous authorizations which I signed with Bickerton's office a few months earlier. A true and correct copy of the authorization that I showed Hsieh in our May 21, 2018 meeting, is attached hereto as Exhibit "II".

The Bickerton authorization states in a red box in the middle, "This Authorization is intended to allow disclosure of information of the patient only. The disclosure of any and all information of non-parties or family members is not authorized, shall

29

not be disclosed and shall be redacted from any and all records produced (Pursuant to the FOIPP Act and HIA Act of Alberta)." <u>Id.</u>

a) Contrary to Hsieh's false allegations, I never altered any records. Hsieh just continues to lie throughout his Declaration. This is perjury. In my deposition of May 28, 2019, Defense asked me why I went to look at my records. I told them I was curious because, I was. I answered truthfully. As explained above, I wanted to know what was in my records to make a decision as to whether I wanted to pursue my psychological damages claims or not. <u>But Hsieh told me before my deposition, that I could not tell Defense that I wanted to drop my psychological damages claims.</u> Hsieh told me that Defense then would argue that I wasn't injured if I did not want to make those claims. I answered truthfully and did as I was told to do by my attorney, Hsieh by not telling Defense that I did not want to pursue my psychological damages claims and I went to look at my records to help me make my decision because I did not know what were in my records before February 2018.

b) Young kept pressuring me and Hsieh was kicking me under the table to keep my mouth shut. I was very tired and did not know what to say anymore, so I just kept repeating that "I was curious," which was the truth. Hsieh would not let me tell Defense anymore. The day before, during depo prep when Hsieh jumped out of my vehicle while I was still driving because we were arguing about our personal relationship again, Hsieh threatened me that if I did not say exactly what he told me to say at the deposition, he would leave me there to fend for myself. Hsieh was very abusive and I was scard of him and his temper. [<u>See</u> Hsieh Decl. Exh. "4"- my More Definite Statement at point 215 (highlighted), [Dkt. 41-2, 78-79/106] which explains this occurence in great detail]

During the breaks, Hsieh took me outside and told me what to say or else. I was not being evasive, I was scard for my safety since Hsieh had already threatened to harm me and my family in March 2019 if I didn't keep quiet about our relationship and his poor representation. As evidenced by the June 8, 2018 email communications,

30

[Exh. "D"] Hsieh was always reminding me and threatening me that if I did not do everything he told me to do he would withdraw and ruin my case. I answered honestly, not deceitfully or evasively as Hsieh alleges. "I was curious because I wanted to know what was in my records" is the absolute truth. Hsieh told me I had to leave out the rest about wanting to drop my psychological damages claims that he forced me to pursue against my will and wishes. Dr. Natho's records were the only records I needed to view to decide if I wanted to pursue my psychological damages claims so that was why I went to look at her records, I only happened to view some of my ob/gyn's records as a few pages were mixed together.

c) When I saw my expert, Dr. Harold Hall, neuropsychologist in 2017 for my IME, I talked to him about there potentially being errors in my records as I had been retrieving my records up until Bickerton's office told me to go to surgery and not to worry about it. When Hsieh began representing me he told me not to bother getting any more of my records in May 2018. Dr. Hall told me that if there were errors in my records that I should have them corrected which is in line with HIPPA and the Health Information Act of Alberta ("HIA"), where I reside permanently. I told Hsieh what Dr. Hall had said and I asked Hsieh in the May 21, 2018 meeting what to do about the errors in my records. **Hsieh directed me to get the records with errors in them amended, just as Dr. Hall had said**.

Since I believed that there was a misdiagnosis by Natho, when I viewed my records in February 2018, and as per my attorney, Hsieh's direction, I wrote a letter, in June 2018 to Alberta Health Services Information and Privacy, as per the HIA requirements and asked to have my record amended (not changed, destroyed in any way or covered up- only on a new page stating that there was an error with the misdiagnosis.) This took nearly a month but Dr. Natho refused to amend the record because she could not remember the details. Therefore, in line with the HIA, I placed a Statement of Disagreement in my file. I told Hsieh about this afterwards and he was not concerned. I filed a Memorandum in Opposition as pro se to Defense counsels Motion to Sanction me for my lawful right in following the laws of Alberta

31

and Hsieh's direction. A true and correct copy of my Memorandum in Opposition (no exhibits), filed August 5, 2019, is attached hereto as Exhibit "JJ".

**My Medical Restrictions Were Ignored By Hsieh**: In Hsieh's Declaration, he conveniently fails to mention that I had medical restrictions for my deposition that he would not allow me to have during my deposition. My doctor wanted to make sure I did not get over stimulated due to my brain injury, ongoing therapy and ongoing post-concussion symptoms. A true and correct copy of two medical letters dated May 21, 2019 and August 24, 2021 written by Dr. Bajwa's describing my necessary medical accommodations for my deposition, are attached hereto as Exhibit "KK".

Hsieh replied back to Defense counsel, when she denied my accommodations, that "I do not believe there will be a problem" and would not file a motion as defense directed him to do to make sure that I got my accommodations- therefore, I got none. A true and correct copy of a May 24 and 27, 2019 email string between Hsieh and Defense counsel Napier, is attached hereto as Exhibit "LL".

During my deposition, by noon I was so overstimulated that I was in the bathroom throwing up, I was dizzy and slurring my words. But Hsieh was not interested in helping out his client. I was not to go past 7 hours of testing (which was way too much time and since then my physician has now changed it to no more than 4 hours a day.) [See Exh. "LL"] and only if I am getting my breaks and am not symptomatic.

But my depo went over 8 hours (started at 9:11 am and ended at 6:17 pm) and I did not get the breaks my physician requested. I told Hsieh in every break that I could not go on any further- but Hsieh knew I was over stimulated, could not eat lunch and was vomiting but he wanted to set me up knowing that I was having major cognitive fatigue. He would not let me stop the deposition as my physician had told me to do and indicated in her medical note. Instead, Hsieh threatened me outside during the breaks to keep going and say what he told me to say or else.

32

Hsieh's motives are clear. He was working against me because he blew my case and to prevent a potential legal malpractice suit. Because he and I were arguing all the time due to the personal relationship breakup and my rejection of Hsieh- he was simply vindictive and purposefully was doing everything he could to harm my case- just like when he failed to file my File Naming of Witnesses due May 31, 2019. But I could not function and had not been for the past several hours, finally against Hsieh's wishes at 5:23:30, I stated,

> Beselt: "I'm sorry, could you repeat that? I'm getting very
> tired." (pg. 236) (I was ignored)

At 5:49:42-51, I stated,

> Beselt: "I think we started to talk about her. But I'm getting
> very tired. And it's getting very difficult for me to
> answer questions."

I wanted to stop the deposition by noon, but Hsieh would not allow it. Instead of my attorney protecting his brain injured client, Hsieh, again was helping out Defense when he cut me off and replied at 5:49:52 to my statement above,

> Hsieh: "Just answer the question."
> Beselt: "Sorry."

(But Hsieh was not done yet trying to harm my case, a minute later (5:50:41) he started to ask me questions again to try and help the defense. Hsieh was again questioning me, not defense counsel, during my deposition as to whether or not I was getting treated without being properly diagnosed (ie. I never had PTSD) when he stated,

> Hsieh: "So you're saying that you were treated for your

PTSD even though she never formally diagnosed
you with PTSD. (pg. 239)

A true and correct copy of pages 236 and 239 of my May 28, 2019 transcripts are attached hereto as Exhibit "MM".

Unlike Hsieh, who strategically adlibbed information in his Declaration that is not accurate to paint a picture of me that is not truthful, I will explain what actually took place during my deposition regarding Natho and the request to amend the errors in my records. A true and correct copy of my May 28, 2019 deposition transcripts, pages 209 to 216 and 238, are attached hereto as Exhibit "NN". Throughout these pages it is obvious that I am having a difficult time just being able to follow the question. I am quite confused by this late hour and very sick, dizzy and am straining to keep going. We are well past the 7 hour mark and that was only if I had my accommodations for my restrictions- but Hsieh would not allow me to have my accommodations.

On page 209 of my transcripts, Young asked me, "Ma'am, do you recall ever asking any of your doctors to change your medical records? I questioned, "To change my records?" (I had never asked anyone to change my records, as noted above). Young replied, "Yes". I replied, "I do not recall that." [Exh. "NN" pg. 209, 7:11] I answered truthfully, because I had not asked anyone to <u>change</u> my records, only to amend on a different page due to errors, as per the laws of Alberta HIA.

Young asked me why did I come to want to look at Dr. Natho's records? [Exh. "NN" pg. 213, 3:3] I answered him honestly and fully when I stated, "Because I wanted to know what was in my records. Because typically, you never know what's in your records. Doctors never typically show you what's in your records." [Exh. "NN" pg. 213, 5:8] This is absolutely 100% truthful. Moments later I answered again, "I wanted to know what was in my record." [Exh. "NN" pg. 213, 19] Because Young was badgering me when I had clearly answered him repeatedly, Hsieh objected, which was very rare, when he stated, " I'm going to object to that instruction or commentary. It's

34

badgering. The question has been asked and answered. Just because you don't like her answer doesn't mean that she's not being responsive." [Exh. "NN" pg. 213, 24:25/ pg. 214, 1:3]

Young then wanted to know why I asked to have a Statement of Disagreement put onto my file at the Health Records hospital location. There clearly was no plan to conceal as Hsieh falsely alleges in his Declaration. If I was planning on concealing, why would I put a Statement of Disagreement on my file and then when Defense could not get my records, I handed over my file to Hsieh to give to Defense after the May 8, 2019 hearing, (part 1) of the Motion for Reconsideration? If you look at the Exhibit "6" to Hsieh's Declaration, you will see my handwritten note at the top right corner which says "Natho 66" which was the page number. I was labelling my medical documents since Hsieh would not get any discovery in my case and could not have them properly bates stamped and provided to defense.

When asked about the Statement of Disagreement I explained because I did not agree with Natho's diagnosis. When Young attempted to insinuate that I did so for the purposes of the lawsuit and because experts were to view my records in the case, I disagreed. [Exh. "NN" pg. 216, 22:25] I responded truthfully when I stated, "<u>NO, I went to view my records because I didn't know what was in my records. When I viewed my records, I realized that there were errors in my records</u>." Id. Unlike Hsieh's declaration which just states, "No", I followed up the "No" with an explanation. At that point in time, February 2018, I was not pursuing my psychological damages claims. The answer I provided is accurate as to why I went to view my records. For 10 minutes of this deposition, my story is consistent and truthful and I explained that I just did not know what was in my records and I was curious to know, which is truthful.

However, Hsieh saw an opportunity with his client that was scard of him because he had been threatening me throughout his entire representation and whom he threatened to harm only a few months earlier. Hsieh always had complete client control. Hsieh

35

would often refer to me as having "Stockholm syndrome" because he was so abusive towards me. [Exh. "A", Decl. ¶ 39, 93, 139, 195]

d) Finally, at 5:24 pm I asked for a break and received it. Unlike Hsieh's false statements of what took place during the break, he never told me I was lying because I wasn't. I asked him if he would allow me to tell Young that I looked at my records because I wanted to decide whether I was going to drop my psych damages claims so that I could let Bickerton know how to proceed. Bickerton wanted an answer by February 2018 as they had begun to resend out my authorizations, this time that I actually signed. But Hsieh told me, No. He did not want me to tell Defense that I wanted to drop my psych claims.

Instead of supporting his client, Hsieh threatened me outside and reminded me that I was to say exactly what he told me to say or else he would leave me and destroy my case. Hsieh told me that I had to tell Young that the records issues were my fault, but that was not true. He kept threatening me and we argued for some time, hence, why this was the longest break that we took in the deposition besides lunch. Hsieh told me that I had to tell Young that I was worried because I wanted to inflate my claims. But that was not the case. I was concerned about the release of my private information and when I realized that Natho had misdiagnosed me, it was the final straw coupled with my family's privacy that made me determine that I did not want to pursue my psychological damages. It was because I was embarrassed, which is what I stated when we came back in from the break. [See Exh. "NN", pg. 238]

Hsieh conveniently left out the part where I stated, "I went back to look at Dr. Natho's records and subsequently Dr. Cooper's as well." When I stated that "I knew my records were going to go", I wanted to add, "If I pursued my psychological damages claims" but Hsieh would not allow me to say what I wanted to say. Through threats, bullying, abuse and intimidation coupled with my brain injury, I was easy prey for Hsieh.

36

Further, I was worried about my reputation because I am a licensed clinical social worker who diagnoses mental illness under the DSM and I had been in private practice. I knew Natho's diagnosis was incorrect and I did not want to have inaccurate information in my records as every professional that works out of that hospital has access to those records and I know a lot of doctors and social workers in that hospital because I had worked out of that hospital for over 10 years. Plus I had been in that hospital in 2017 for weeks due to the sepsis from my triple spine surgery from the umbrella. I was so embarrassed knowing that some of my co-workers would have read Natho's notes with the inaccurate information.

There is no crime in wanting to have accurate records. I was not dishonest. I was way past my cognitive limits as my doctors May 21, 2019 medical note, only a week before the depo, stated that I was having ongoing post-concussion symptoms. [Exh. "KK"]

More importantly, Hsieh was outside threatening me to say that I was responsible for the discovery issues and that I wanted to inflate my claims. But because I was over stimulated and was scard of his temper and abandonment- I tried to say what he wanted but I just could not say the things that he was demanding of me to say because they were not true. A false diagnosis on my record could hinder what I experienced so I was worried about it. There is nothing criminal or fraudulent about worrying and wanting accurate information in your medical records. Bottom line is that Dr. Raffle has opined that the post-partum depression diagnosis is likely incorrect. I followed the proper channels, once I realized the error in my records in or about February 2018, and based on the direction of my attorney, Hsieh, I went through the proper channels to correct my records so that they were accurate as thousands of people do every day in every state and country. HIPPA is compliant with amendments and so is the HIA.

Keep in mind, I did not want to pursue my psychological damages claims as noted in my call with Green on March 2, 2018 [Exh. "GG"] and it was Hsieh that forced

37

me to pursue my psychological claims under the threat of withdrawal. [Exh. "A" Decl. ¶ 20 (Exh. "4" Suppl. Decl.)] I certainly was not interested in inflating my claims as Hsieh alleges- and he never accused me of lying because that did not happen. The only reason I said what I did after the break was because of Hsieh's threats.

Hsieh set me up with his question, "And you felt it important to correct that because of this lawsuit?" You have to wonder why your own lawyer is asking you questions in your deposition and cutting you off and demanding that his client, "just answer the question." He took over Defense's role against his own client. This clearly shows Hsieh's motives and he should be disbarred for this conduct. Especially now with his newest lie (I had not heard this one before) that he accused me of lying outside… in his Declaration. That is pure fabrication. Simply put, there is nothing Hsieh won't say or declare to get himself out of the hole he has dug for himself cheating and lying all these years.

e) The note that Hsieh refers to is a Statement of Disagreement. It simply tells anyone who looks at my records that I do not agree with Natho's diagnosis. It has not altered my records in any way. Although Hsieh again limits my response to state that I only said "No…" to Young's question. That is deceitful and an attempt to manipulate this court. Again, what Hsieh left out is … I stated, "NO, I went to view my records because I didn't know what was in my records. When I viewed my records, I realized that there were errors in my records. That statement is 100% truthful. As already explained above, I disagreed with the diagnosis regardless if experts viewed the records from 4.5 years prior to the blow to my head by the umbrella. I wanted accurate information in my file, which is not illegal.

57. [Dkt. 41, Par. 33] Hsieh is the only one that lacks credibility as evidenced by his deceitful Declaration. Hsieh pulled these statements straight out of Waldorf's pleadings- in a last ditch effort to attack me and my credibility because he has none himself.

38

The reason that the Waldorf filed a Motion to Compel had nothing to do with me. They filed it because my attorney's would not lift a finger to obtain any of my records and because of Bickerton's forged authorizations in 2017. [Exh. "R", Hsieh's Memo in Opp. to Waldorf's Motion to Compel] Hsieh repeatedly told me I had a damages only case as the Waldorf admitted liability and punitive damages were likely due to the egregiousness of the amount of injuries those umbrella's caused (more than 5 occurrences in the 2 years leading up to my incident). But Hsieh sat around and allowed Waldorf to not pay for the records, although he knew that they weren't paying for the records as I told him repeatedly in email after email. Hsieh told me not to interfere or get any more of my records. Waldorf played discovery games and my counsel, Hsieh, was only worried about getting in my pants.

As to point 1) I signed the authorizations in February 2018 as Bickerton provided. He was the only attorney I had that asked me to sign authorizations to obtain my records. [Exh. "II"] Hsieh et al. never asked me to sign authorizations because he refused to get discovery but left it for defense who didn't get discovery either. This is evident at the Motion to Compel hearing when Hsieh stated,

> "MR. HSIEH: As they're coming in, our agreement with Goodsill is that <u>as they get the records</u>, they will share it with us, we will split the cost of the medical records." [Exh. "OO" pg. 17 Feb 13/19 TR.]

A true and correct copy of page 17 of the February 13, 2019 hearing on the Motion to Compel, is attached hereto as Exhibit "OO". But Waldorf had no need to get the records. They did not have the burden of proof. The blank authorizations that Cahill ordered me to sign were an issue because of what took place in 2017 with the forged authorizations. Hsieh knew it. [Exh. "HH"] Defense knew it. But Hsieh did nothing to fix it.

39

As to point 2) The revoking of authorizations in 2017 was done by Bickerton once they came to realize that their legal assistant had forged my authorizations. That again was not my fault. [Exh. "R", pgs 4-10 in the pleading]

As to point 3) That never happened either. The only time I advised a few of my providers that I had not signed the authorizations was in September 2017 when I discovered that someone had forged authorizations but Bickerton's office would not respond to me for over a week. So when a few providers asked what was going on, I told them I did not know and that I did not sign any authorizations in 2017 as I was in Germany having triple spine surgery. I told them the truth. [Exh. "R", pgs. 9-32 in the pleading]

b)  The March 14, 2019 Order was drafted by Waldorf and was not what Judge Cahill had ordered at the February 13, 2019 hearing on the Motion to Compel. I repeatedly asked that Hsieh write to the court to correct it but he replied, "By doing nothing, it means that I oppose it." He could not be bothered and he did not oppose the incorrect Order nor did he send a letter to Judge Cahill to correct it.

As to point 1) I did not interfere. Hsieh told me not to go and get anymore records, which I listened and did as I was told until February 13, 2019 when I raced around Calgary, Alberta to get my records in that day. Hsieh took a nap and would not bates stamp the hundreds of pages that I had obtained. I was the only one who brought in my records. Between February and June 2019, I brought in over 5600 pages of medical and employment records as Hsieh would not life a finger to get discovery on a damages only case.

As to point 2) The July 20, 2018 Status Conference hearing was a disaster because Waldorf filed a huge memorandum falsely accusing me of withholding discovery since I had had Green, Hsieh and Uesugi retained for nearly 5 months but none of my attorneys would send me authorizations and begin to get my records. Instead, Hsieh filed a 2 page Status Conference Memorandum which states, "Plaintiff's new counsel, Michael Jay Green and Peter C. Hsieh have not conducted any

40

discovery. In fact, substantial discovery has not been completed by the parties." A true and correct copy of the July 16, 2018 Status Conference Memorandum filed by Hsieh, is attached hereto as Exhibit "PP". Hsieh threatened to withdraw in a phone call on June 8, 2018 and even though we emailed him that we would do anything he told us to so that he would not withdraw over the May 31, 2018 synopsis email and whether or not records could be held incamera, he would not get back to us until July 11, 2018. We sat waiting for 5 weeks and no response from our counsel to our emails. [See Exh. "D"]

Additionally, Hsieh conveniently leaves out the words, "PLAINTIF~ HAS 10 DAYS TO EXECUTE RELEASES AND THERE WILL BE NO REDACTIONS" in his Declaration. [ Exh. "6" Hsieh Decl.] I promptly signed the blank authorizations ordered by the Court the next day, on July 21, 2018. I had not interfered in any way, I only waited for my attorneys to get back to us after emailing Hsieh multiple times but he would not until July 11, 2018 and the damage was already done in the eyes of Judge Cahill. Cahill had the wrong impression of me because of Hsieh et al. The allegation that I interfered by Waldorf was false- but again Hsieh did not want to oppose their Order. Hsieh just keeps painting a false narrative to this Honorable Court.

As to point 3) I never interfered. The providers in Alberta must redact Third party information as it is the law, especially if Defense counsel out of country is getting records. In Canada the records only go to Plaintiff's attorneys and after Bickerton's forged authorizations providers were leery about producing any document improperly. [Exh. "R"] One breach in Alberta comes with a $100 000 fine. Had Hsieh gotten my records, it would have been a different outcome. Previous authorizations by Bickerton stated no third party information should be given. [Exh. "II"] When I spoke with my employer, Alberta Health Services ("AHS") in March or May 2018 that was what I believed that the authorizations should say. Hsieh et al. were not sending me authorizations to sign that said anything differently. When I spoke with Charla Haynes in March 2018, I told her to just follow whatever the direction of the authorization stated, when it came. Waldorf never sent an authorization. Mark Beselt requested that his information and that of our children not be released as none of them were party to

41

the lawsuit. Therefore, AHS confused about what to do- issued an incorrect letter on January 31, 2019 and would not send out my records until I sent them the March 2019 proposed order (rough before it was filed). They sent my employment records out that same day because they knew that they had made a mistake.

AHS has no record of any verbal conversations between Charla Haynes and I. AHS made an error in submitting that letter to Waldorf and have provided me a letter to correct their error. A true and correct copy of an April 11, 2023 letter from AHS, is attached hereto as Exhibit "QQ".

Naturally, Hsieh, while representing me would not contact my employer to request a correction letter. My employer, AHS was advised by legal counsel not to issue me a letter until I was no longer employed with them which was not until 2022. Additionally, contrary to what Hsieh declares, Cahill did not attach the letter to the Order, Waldorf did because Waldorf provided the Court its Proposed Order and Waldorf dictated the entire litigation once Hsieh began his representation.

c) All points 1-6) Waldorf had a serious case to litigate. They did not have the facts on their side nor did they have the truth- therefore, the only thing they could do was come after the Plaintiff and attack my credibility before my bench trial Judge. My counsel did nothing to prevent the issues from arising and once the case blew up, which happened to coincide with the break up of our relationship, shortly thereafter, Hsieh worked against me in an attempt to save his own butt, as evidenced in my May 28, 2019 deposition in which he was interrogating his own client.

I was sanctioned because of my counsel's lack of work, namely they would not work on supplementing my interrogatories as I had requested repeatedly and would not get my medical and employment records. Hsieh knew that there would be record issues given Bickerton's offices mistake in 2017 as I had filled him in on it at great length in our May 21, 2018 meeting. [Exh. "HH", pt. 1] Hsieh also emailed Defense counsel Napier and explained to her about the forged authorizations and that the providers did not want to provide records on blank authorizations as they did not know if I had

42

signed for them or not. A true and correct copy of an October 18, 2018 email string which Hsieh forwarded to me between him and Waldorf counsel regarding all the records issues, is attached hereto as Exhibit "RR".

Many times, I requested Hsieh help me with supplementing interrogatories as per the Defenses' request, but he would not. A true and correct copy of a November 7, 2018 email between Hsieh and I, is attached hereto as Exhibit "SS".

In this November 7, 2018 email, I stated, "Lastly, Mr. Hsieh- as we discussed, we need to go over my interrogatories since previous counsel made so many errors, etc. Please book a time to look over my interrogatories and contact me with any questions you may have." [Exh. "SS", pt. 5] We discussed it in Victoria, BC in mid November 2018 when we were together as well. But it was not important to Hsieh that his client provide discovery.

In a text message to Hsieh on January 8, 2019, I stated, "What am I supposed to respond about my 2nd set of interrogatories." A true and correct copy of text messages between Hsieh and I, is attached hereto as Exhibit "TT".

Hsieh did admit that it was him that should have been sanctioned for the discovery issues at the May 24, 2019 Motion for Reconsideration hearing (part 2), when he stated, "If the Court feels that our response in producing these documents and the list of doctors in lieu of a formal response to the interrogatories, **please sanction me."** [May 24/19 Hr. Tr. (pg. 30, 11:15)] A true and correct copy of the May 24, 2019 hearing transcript, pg. 30, is attached hereto as Exhibit "UU".

58. [Dkt. 41, Par. 34] Bosko Petricevic ("Petricevic") wanted Mark and I to sign a representation agreement and to hire him to represent us in another matter. There was a misunderstanding between Petricevic and us. Therefore, he angrily wrote the email on March 2, 2023 at 8:48 am and withdrew as my attorney, as per Hsieh's Declaration, Exh. "8". But once we discussed the issue with Petricevic, only a few hours later, he was asking for me to rehire him back into the arbitration. A true and correct copy of an

43

email from Petricevic to Mark and I, dated March 2, 2023, is attached hereto as Exhibit "VV". This March 2, 2023 email sent to us at 2:26 pm states, "All I wanted was my representation agreement (that you signed in the other case) signed" and "sign the agreement and I will still represent you in Green case."

On March 7, 2023, I emailed everyone, including Hsieh, a copy of Petricevic's email dated March 2, 2023 at 2:56 pm. In my email to everyone, I stated, "My sincerest apologies your Honor. Bosko has overreacted based on a misunderstanding. No one has lied to him, scammed him or defrauded him. Only a few hours later he was telling me he would represent me in this arbitration again. See attached email." A true and correct copy of the March 7, 2023 email which I emailed to Hsieh, is attached hereto as Exhibit "WW".

Naturally, Hsieh conveniently left this material information out in his Declaration. Clearly, Hsieh lacks credibility, not me.

59. If I had done anything that Petricevic had falsely accused me of, then why would he want to represent me again?

60. What Hsieh has done to me and my family is egregious and he should be held to account for his actions- both financially and professionally through the ODC. He has been an attorney for 45 years and it is time for him to own up to the problems that he has caused others.

61. Hsieh has lied through his entire Declaration to paint a picture that simply is not true. Since I clearly have disputed every claim that Hsieh has made, it is just and right to have this Honorable Court award me for my honesty and perseverance in having to deal with Hsieh and all his lies.

"The one who states his case first seems right, until the other comes and examines him."  Proverbs 18:17.

DATED:  July 18, 2023 in Honolulu, Hawaii


RONDA MELNYCHUK-BESELT

45